## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**TERESA D.  GREEN,**

       **Plaintiff,**

                                    **Civil Action 2:13-cv-41**

    **v.**                                **Magistrate Judge Elizabeth P. Deavers**

**CENTRAL OHIO TRANSIT
AUTHORITY,**

       **Defendant.**

### OPINION AND ORDER

Plaintiff, Teresa Green ("Green"), brings this action against her former employer, the

Central Ohio Transit Authority ("COTA"), pursuant to Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e *et seq.*("Title VII") and the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101 *et seq*.  On August 20, 2013, the Court dismissed Green's claims of race

discrimination in violation of Title VII and failure to accommodate in violation of the ADA for

failure to state a claim.  (ECF No. 21.)  Green's only remaining claim in this action is that COTA

retaliated against her for filing charges with the Equal Employment Opportunity Commission

("EEOC") and the Ohio Civil Rights Commission ("OCRC") about the alleged racial

harassment.  This matter is before the Court for consideration of COTA's Motion for Summary

Judgment on Green's retaliation claim (ECF No. 41), Green's Response in Opposition to

COTA's Motion (ECF No. 49), and COTA's Reply (ECF No. 50).  For the reasons that follow,

COTA's Motion for Summary Judgment is **GRANTED**.  (ECF No. 41.)

### I.    BACKGROUND AND RELEVANT FACTS

COTA is a political subdivision of the State of Ohio that provides public mass

transportation in central Ohio.  COTA has four office locations: a downtown administrative office on North High Street and three storage and maintenance facilities at McKinley, Fields, and Essex Avenues.  Each facility has a Facilities Manager who reports to COTA's Director of Facilities, Tim Smith ("Smith").  At the time of the alleged retaliation, Jon Hancock ("Hancock") was the Facilities Manager for the McKinley location, Stephan Douglas ("Douglas") was the Facilities Manager for the Fields location, and Vince Zeno ("Zeno") was the Facilities Manager for the Essex location.

Green is an African American woman who suffers from a chronic lung condition, sarcoidosis.  She began her career at COTA as a Vehicle Maintenance Clerk on March 19, 1992 and worked there until she was terminated on September 8, 2011. (Green Dep. at p. 91, ECF No. 40-1.)  In 2008, Green was promoted to Facilities Coordinator and was transferred to the Fields Avenue facility.  In September 2010, after COTA opened administrative offices in downtown Columbus, Green was transferred to COTA's McKinley Avenue facility, where she was supervised by Hancock.  (Smith Dep. at p. 143, ECF No. 39-1; Hancock Dep at p. 41-42, ECF No. 37-1.)  As a result of the transfer, Green was required to take on receptionist duties and sit at the reception desk, which made it difficult for her to complete her other Facilities Coordinator duties.  (ECF No. 37-16.)  Hancock recognized the difficulties Green faced due to performing both roles and sent Smith a memorandum informing him about the problem and requesting assistance.  *Id.*  Green continued to perform both roles while stationed at the McKinley facility.

On September 27, 2010, Hancock sent Green an email providing her with his expectations regarding attendance.  In the email, Hancock stated as follows:

> Over the past week I've noticed a trend of attendance related issues including repeated tardiness. . . .

According to the Facility Staffing Memo 2010, your posted work hours are from 7:00 am to 4:00 pm, Monday through Friday, with lunch from 1:30-2:30 pm.  If you wish to alter these hours, please discuss them with me personally.

As per item V.A.2. of the Attendance policy mentioned above, please be sure [to] call me prior to your start time if you expect to be tardy or absent.  As previously explained to you personally, you may call me at home, at the office, or on my COTA cell phone to report your attendance concerns.

I realize you may have had other arrangements in the past, but, as your supervisor, these are my expectations for your attendance performance.  There may be other such arrangements of which I'm unaware, and therefore, no longer apply.  If you wish to continue these privileges, please speak to me in person.  Perhaps we can come to an understanding.  Working through these issues should eliminate any confusion or misunderstanding.

If you wish to discuss this memo or your scheduled work hours, please feel free to see me personally.

(ECF No. 40-22.)

On September 29, 2010, Green sent an email to Hancock regarding her work hours and stated "Just to confirm my daily hours are from 7:30am until 4:00pm.  Would you have a problem if I started at 7:15am?  Most days I do get here at 7:15am."  (ECF No. 37-7.)  Hancock responded, "7:15 is fine." [1]  (*Id*; Green Dep at pp. 165-66, ECF No. 40-1.)  Green testified that she was unable to take a lunch break because she was not allowed to leave her desk in the reception area unattended.  (Green Dep. at p. 268, ECF No. 40-1.)  Accordingly, when viewing the facts in a light most favorable to Green, she was required to work from 7:15am to 3:15pm to complete her required eight hours of work.  The record indicates that when she needed to alter her work hours, she would email or call Hancock.  *Id.* at 168-69; (ECF No. 37-8.)  As Green's

---

[1]The Court notes the discrepancy between the daily work hours provided in Hancock's email to Green and the daily hours requested in Green's email to Hancock.   As explained below, in viewing the facts in a light most favorable to Green, she was required to work from 7:15am to 3:15pm to complete eight hours of work.

supervisor, Hancock was responsible for approving her timecard each pay period. (Hancock Dep. at pp. 115-122, ECF No. 37-1.)

In January 2011, Green and Hancock's working relationship began to deteriorate after Hancock completed Green's work performance review, which she perceived to be negative. (Def.'s MSJ 5, ECF No. 41; Pl.'s Resp. in Opp. 6, ECF No. 49.) Subsequently, they met to discuss her work performance and it became apparent that their working relationship was worsening.[2] In an effort to resolve any differences, COTA's human resources department coordinated meetings with Smith, Hancock, and Green. (Hancock Dep. at pp. 100-04, ECF No. 37-1; ECF No. 37-12; Green Dep. at p. 205, ECF No. 40-1.) Shortly thereafter, on February 10, 2011, Green filed charges with the OCRC and the EEOC against COTA alleging racial and disability discrimination, as well as retaliation. (Green Dep. at pp. 204-05, ECF No. 40-1; ECF No. 40-28.) More specifically, she alleged that since September 2010 Hancock continuously discriminated against her on the basis of her race and disability.[3] Id.

In May 2011, Hancock took a leave of absence under the Family Medical Leave Act ("FMLA").[4] (Green Dep. at pp. 208-09, ECF No. 40-1; Hancock at pp. 189, 202, ECF No 37-1.)

---

[2]For example, Green asserts that Hancock unlocked her desk while she was out of the office, removed copies of her work performance evaluation that contained her comments, and replaced them with blank copies. (Pl.'s Resp. in Opp 7, ECF No. 49.)

[3]Green alleged that she had been "harassed, received a negative performance evaluation, disciplined and denied a reasonable accommodation due to consideration of [her] being disabled, Black, and in retaliation for her complaining of discrimination." (ECF No 40-28.) She alleged that "Hancock has a pattern and practice of harassing Black employees, yet [COTA] has not adequately addressed [it]." Id.

[4]As discussed more fully infra, prior to taking FMLA leave, Hancock violated COTA's policies by providing information to a potential vendor during a bidding process. (Hancock Dep., Ex. 5, ECF No. 37-5.)

4

Hancock did not return to work until August 22, 2011.  *Id.*  While Hancock was on FMLA leave, Zeno covered Hancock's duties at the McKinley Avenue facility, including approving Green's timecard.  (Zeno Dep. at pp. 44-45, ECF No.  47.)  On at least one occasion, Zeno noticed that Green's timecard was inaccurate and directed her to correct her timecard to reflect her actual hours worked.  (ECF No. 40-31; Green at p. 215, ECF No. 40-1.)  Additionally, on July 28, 2011, Zeno approached Green and informed her that other COTA managers were unhappy that she was not at the reception desk when visitors arrived.  (Green Dep. at pp. 212-13, ECF No. 40-1; ECF No. 42-41.)  Zeno informed Smith about the managers' complaint that she was not at her desk.  (ECF No. 42-41.)

On June 7, 2011, Green filed a second charge with the OCRC alleging that COTA discriminated against her by failing to accommodate her disability[5] and retaliated against her for filing the February 20, 2011 discrimination charge.  (ECF No. 40-32.)  In response to this charge, COTA agreed to transfer Green to the administrative office at North High Street, where she would not be around fumes or under the supervision of Hancock.  (ECF Nos. 40-32–40-35.)  Green subsequently withdrew the charge in August 2011.  *Id.*  Thus, after August 8, 2011, Green was transferred and began reporting to Smith.  (ECF No. 39-40.)

In early August, Aaron Tompkins ("Tompkins"), associate legal counsel for COTA, approached Smith and informed him that two supervisors had approached him and stated that they noticed that Green often came in late and was rarely at her desk.  (Smith Dep at pp. 200-05, ECF No. 39-1; ECF No. 42-22.)  After receiving this information from Tompkins, Smith

---

[5]Green alleged that due to her chronic lung condition, she cannot be exposed to bus fumes.

authorized an investigation into the matter. *Id.*

In the interim, on August 22, 2011, Hancock returned from FMLA leave. When he returned to work, he received a Final Warning letter from COTA's Chief Financial Officer Marion White ("White") for his failure to follow COTA's procedures for dealing with potential vendors back in May. White explained that Hancock's continuous pattern of inappropriate comments and unprofessional behavior was concerning and this warning was final. [6] He also informed Hancock that "a current OCRC charge has been filed against [him], which will be investigated upon [his] return [from FMLA leave]. The outcome of this case is yet to be determined. If however, it is proved valid, it could affect [his] employment status." (ECF No. 37-5.)

Green believes that Hancock and Zeno were the two managers who went to Tompkins about her attendance issues.[7] Hancock testified, however, that he did not talk with Smith or

---

[6]COTA had disciplined Hancock on several occasions for issues ranging from making inappropriate comments to violating COTA's ethics policies. (ECF Nos. 37-3, 37-4, 37-5, 37-15, 37-18.)

[7]On this point, Green asserts that

Vince Zeno and John Hancock both deny that they were the two managers that spoke with Aaron Tompkins regarding Plaintiff's falsification of timecards. Tim Smith does not name the managers in his affidavit and no one in defendant's management has named the whistleblowers. Common sense points to Vince Zeno and John Hancock as the two managers in question. Jon Hancock returned from FMLA to his job on August 22, 2011 and Vince Zeno was Plaintiff's current manager at that time. It does not take a stretch of the imagination to believe that both blew the whistle on Teresa because both demonstrated contempt and disdain for Plaintiff as a person and employee.

\* \* \*

Jon Hancock and Vince Zeno were the two supervisors in Plaintiff's opinion that went to Aaron Tompkins. Both disliked Plaintiff, harassed her on her job and by

Tompkins about the timecard investigation and that he was not aware of the investigation until after COTA terminated Green's employment.[8]  (Hancock Dep. at pp. 207-08, ECF No. 37-1.) Further, Smith testified that he did not know which managers reported Green's timecard violations to Tompkins, but he did not think it was Hancock or Zeno.  (Smith Dep. at 201-204, ECF No. 39-1.)

After receiving authorization from Smith, Tompkins reviewed Green's timecards, access badge swipes, and COTA's security footage to determine the times she arrived and left each day. On August 24, 2011, Tompkins wrote a memorandum to Smith and COTA's Vice President of Human Resources Kristen Treadway ("Treadway") summarizing his results.  Tompkins stated as follows:

> I conducted an investigation into Teresa Green's timekeeping after receiving notice from two supervisors at McKinley that noticed she came in late or she was rarely at her desk during work hours.  I examined her card reader report from May 26 (the earliest date that data could be captured) until August 10, 2011 (the date that I requested the information).  I verified with Vince Zeno that Teresa Green's hours were 7:00am to 3:00pm.  Upon receiving the report I noticed that Teresa routinely scanned her card to enter the building after her work hours had begun.
>
> . . . After identifying several days that Teresa claimed eight hours of work but came in up to 30 minutes late, I contacted Security to view the video from the building so I could identify Teresa entering and leaving the building to insure she was working the hours that she claimed.
>
> The card reader report showed that Teresa was late on 5/27/2011, 5/31/2011, 7/1/2011 and 7/6/2011.  The card reader report showed that she was on time for

their own admission did not observe Plaintiff on a consistent basis.

(Pl.'s Resp. in Opp. 8-9, ECF No. 49.)

[8]Hancock also testified that he did not talk with Smith or Zeno while he was on FMLA leave.  (Hancock Dep. at p. 205, ECF No. 37-1.)  The investigation into Green's timecard was initiated during the time Hancock was on FMLA leave.

most of July. I decided, however, to focus on watching tapes from June because that is the bulk of the late arrivals even though there could also be early departures in July.

\* \* \*

(ECF No. 39-18.) After receiving the report, Smith, Treadway, and COTA's Director of Human Resources Shirley Graham ("Graham") met to discuss Green's attendance issues. (ECF No. 39-32.) At the meeting, they decided to extend the investigation for a longer period of time in case the month of June was an aberration. *Id.* Tompkins subsequently investigated Green's arrival and departure times between January and June 2011. *Id.*

On August 30, 2011, Smith, Treadway, Graham, and Tompkins met for a second time to discuss Tompkin's findings. Again, the investigation revealed that Green habitually arrived late to work and still reported that she worked her assigned eight hours.[9] (ECF No. 38-9; ECF No. 39-32.) They then discussed possible disciplinary measures to impose upon Green for her theft of time and time card falsification, including suspension and termination. (Smith Aff. ¶ 12, ECF No. 39-32.) At the end of the meeting, the group decided that Green should be suspended for three days. *Id.*

Smith testified that after giving the issue more thought, he decided termination was a more appropriate sanction. He explained as follows:

Before the meeting [with Green] on September [8] and after giving the issue much thought, I decided that terminating Green's employment was appropriate. I believed that [COTA] could not allow an individual with such excessive timecard violations to remain at COTA. I believed that it would set a bad precedent for COTA in the future and strongly believed that her actions amounted to theft in office.

(Smith Aff. ¶ 13, ECF No. 39-32.) When he informed Treadway, Graham, COTA's Chief

---

[9]The investigation revealed that Green arrived late and/or left early over sixty (60) times. (ECF No. 42-22; ECF No. 40-43; ECF No. 40-42.)

8

Executive Officer W. Curtis Stitt ("Stitt"), and White that he intended to terminate Green, they all agreed with his decision.  *Id.* at ¶ 14-15.  On September 8, 2011, Graham and Smith met with Green and informed her that her employment with COTA was terminated for theft of time and timecard falsification.  *Id.* at ¶ 16.  Green asserts that she was falsely accused of falsifying her timecards and theft of time.  Nevertheless, when Green was shown photos of what COTA believed to be her leaving the facility before 3:15pm, she testified "I'm not disputing, but I'm just saying I can't tell if it's me or not."  (Green Dep. at p. 243, ECF No. 40-1.)

After Green left COTA on September 8, 2011, she filed a third charge with the OCRC and the EEOC, alleging that COTA terminated her in retaliation for filing the prior discrimination charges.  The EEOC sent Green a right-to-sue letter on October 22, 2012. (Compl., ECF No. 2-1.)  Subsequently, on January 15, 2013, Green filed the instant action asserting claims for (1) racial discrimination in violation of Title VII; (2) failure to accommodate in violation of the ADA; and (3) retaliatory discharge.  On August 20, 2013, the Court dismissed Plaintiff's discrimination and failure to accommodate claims.  (August 20, 2013 Opinion and Order, ECF No. 21.)  Consequently, Green's retaliatory discharge action is her only remaining claim before this Court.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The moving party has the initial burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party."  *Stansberry v. Air*

*Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the Court may "consider the fact undisputed for purposes of the motion").

"Once the moving party meets its initial burden, the nonmovant must 'designate specific facts showing that there is a genuine issue for trial.'" *Kimble v. Wasylyshyn*, No. 10–3110, 2011 WL 4469612, at \*3 (6th Cir. Sept. 28, 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, . . . there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotation marks and citations omitted). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stansberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

## III.   ANALYSIS

COTA moves for summary judgment on Green's sole remaining claim of retaliatory discharge. COTA contends that Green cannot show a causal connection between her protected activity and discharge or that COTA's legitimate, non-discriminatory reason for terminating her was pretextual.

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee . . . because he [or she] has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e–3(a)). "Retaliation claims are treated the same whether brought under the ADA or Title VII." *Barrett v. Lucent Techs., Inc.*, 36 F. App'x 835, 840 (6th Cir. 2002) (citing *Penny v. UPS*, 128 F.3d 408, 415 (6th Cir. 1997)). In analyzing retaliation claims, courts "apply the *McDonnell Douglas/Burdine* framework of shifting burdens of production and proof." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

To establish a *prima facie* case for retaliation, a plaintiff must show each of the following elements:

> (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595 (6th Cir. 2007) (citing *Morris v. Oldham Cty. Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000)). "If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* The plaintiff then bears the ultimate burden of proving that "the proffered reason for the action was merely a pretext for discrimination." *Penny*, 128 F.3d at 415 (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990)).

11

In the instant action, COTA does not dispute that Green has demonstrated the first three elements of a *prima facie* case for retaliation.  First, Green has shown that she engaged in an activity protected by Title VII when she filed charges against COTA with the OCRC and the EEOC.  *See Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012) ("Under Title VII, there are two types of protected activity: participation in a proceeding with the Equal Employment Opportunity Commission ("EEOC") and opposition to an apparent Title VII violation.").  Second, COTA does not dispute that it was aware that Green had filed charges at the time it terminated her employment.  Indeed, COTA even worked with Green to accommodate her disability after she filed her second charge.  Third, it is undisputed that Green was terminated from her employment with COTA on September 8, 2011, after she filed two charges with the OCRC against COTA.  Accordingly, Green has demonstrated the first three elements of her retaliation claim.

The parties do, however, disagree over whether Green can demonstrate a causal connection between her filing discrimination charges and her termination.  COTA contends that Green cannot prove causation and her claim for retaliation therefore must fail as a matter of law. On the contrary, Green submits that she can show causation.  She specifically points to the temporal proximity between Hancock's receipt of a final warning letter upon his return from FMLA leave, which mentioned Green's discrimination charge and its potential effect on his employment, and the investigation into her timecard falsification and ultimate termination approximately two weeks later.

COTA also contends that summary judgment is warranted because even if Green can establish a *prima facie* case for retaliation, she cannot prove that COTA's non-discriminatory

reason for terminating Green's employment—theft of time—was merely a pretext for retaliation. Green's primary opposition to this contention is that COTA did not terminate her for a legitimate business reason because she did not steal time from COTA. She submits that a genuine issue of material fact exists as to whether she in fact falsified her timecard and stole time from COTA.

Thus, the issues before the Court are (1) whether a reasonable jury could conclude that a causal connection exists between Green filing discrimination charges and her eventual termination from COTA, and (2) if Green can establish a *prima facie* case for retaliation, whether a reasonable jury could conclude that COTA's legitimate, nondiscriminatory reason for terminating Green—theft of time—was merely a pretext for retaliation.

## A.    Causal Connection

"To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse [employment] action." *Michael*, 496 F.3d at 596 (quoting *Dixon*, 481 F.3d at 333) (internal quotation marks omitted). "Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." *Michael*, 496 F.3d at 596 (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006)) (internal quotation marks omitted). "Beyond temporal proximity, other indicia of retaliatory conduct would include evidence that the plaintiff was treated differently, either less positively or more negatively, than similarly situated employees who had not exercised Title VII rights . . . or evidence that the plaintiff was subjected to closer disciplinary scrutiny after exercising Title VII rights." *Evans v. Prospect Airport Servs., Inc.,* 286 F. App'x 889, 895 (6th Cir. 2008) (internal citations omitted).

13

COTA contends that summary judgment is appropriate because Green fails to establish a causal link between her protected activity and termination or to raise any facts that demonstrate a genuine issue for trial.  (Def.'s MSJ 2, ECF No. 41.)  Green's position is that Hancock and Zeno reported her timecard violations to Tompkins to retaliate against her for filing discrimination charges with the OCRC and EEOC.  Green asserts that "[t]he causal connection is Marion White's memo to Jon Hancock that stated his future at COTA depended on the outcome of the discrimination charge with COTA."  (Pl.'s Resp. in Opp. 14, ECF No. 49.)  Green further submits that "[i]t is no mere coincidence that two (2) days after Hancock's return to work from FMLA leave Tompkin[']s report surfaces about [Green's] falsification of time cards." *Id.* at 16.  COTA maintains that Green has not presented any facts to support her position and that speculation is insufficient to establish causation.  Specifically, COTA challenges Green's argument as follows:

> [T]o accept [Green's] unsupported conjecture that Mr. Hancock reported [Green's] timecard issues and convinced Mr. Zeno to do the same after Mr. Hancock returned from medical leave and received notice of a charge pending, this Court would have to disregard *undisputed* evidence establishing that:
>
> - Mr. Hancock was on medical leave until August 22, 2011.  The evidence established in discovery shows that the time card investigation had already commenced long before Mr. Hancock's return to work.
>
> - Mr. Hancock testified that he neither initiated a discussion with Tim Smith, nor spoke to Tim Smith or Aaron Tompkins regarding any timecard investigation of [Green].  Mr. Smith corroborated Mr. Hancock's testimony.
>
> - There are many managers at COTA who could have complained about [Green's] time away from her desk.  In fact, on July 28, 2011, Mr. Zeno received complaints from two supervisors/managers at McKinley regarding [Green] not being at her desk when visitors arrived.

14

- COTA's in-house attorney, not Mr. Hancock or Mr. Zeno, brought the information to Mr. Smith's attention.

- Mr. Smith, who testified about the seriousness of [Green's] behavior, alone made the decision that the legal department should conduct a review into the timecard issue.  Mr. Smith had no independent knowledge of the original source of the complaints.

- On August 10, 2011, COTA's in-house attorney (whom [Green] has never alleged had any animus or retaliatory motive), and not Mr. Hancock or Mr. Zeno, began his independent review of [Green's] timecard falsification.

- Mr. Smith, after consulting with Kristen Treadway, Vice Preisdent of Human Resources and Labor Relations; Shirley Graham, Human Resources Director; Curtis Stitt, CEO; and Marion White, CFO, made the decision to terminate [Green's] employment.

(Def.'s Reply 4-5, ECF No. 50) (internal citations omitted).

The Court agrees with COTA that Green fails to demonstrate a causal connection between her protected activity and termination.  Her theory that Hancock and Zeno reported her attendance issues to Tompkins to retaliate against her is speculative at most.  Her theory fails for the following reasons: (1) Hancock did not know that she had filed EEOC charges until after he returned from FMLA leave on August 22, 2011; (2) the undisputed evidence in the record shows that the investigation into her timecard violations began prior to Hancock returning from FMLA leave; and (3) Hancock testified that he knew nothing of the investigation until after she was terminated.  Moreover, when asked what facts made her believe she was discharged from COTA due to her protected activity, Green testified as follows: "I don't have any actual facts.  It was my belief, based upon the years that I was there, and how I witnessed how things were done with the employer."  (Green Dep. at pp. 44-45, ECF No. 40-1.)  Green's mere belief that Hancock and Zeno fueled the investigation into her timecard falsification to retaliate against her is insufficient

15

to overcome COTA's Motion for Summary Judgment.  *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 519 (6th Cir. 2009) (finding that conclusory statements, subjective beliefs, or intuition cannot defeat summary judgment on retaliation claim) (citing *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996)); *Evans*, 286 F. App'x at 896 ("[R]ather than setting forth specific facts which would justify an inference of causation, [plaintiff] has only offered unsupported allegations that he was retaliated against on account of his filing of EEOC complaints); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record").

Moreover, even if Hancock and Zeno did report her attendance violations to Tompkins, the undisputed evidence demonstrates that Tompkins conducted the investigation at the direction of Smith and that neither Hancock nor Zeno had any part in the investigation.  Further, Smith testified that he made the ultimate decision to terminate Green's employment for theft of time and timecard falsification.  Smith also testified that Green's pending discrimination charges were never discussed in the conversations leading up to her termination.[10]  Green has not presented any evidence to dispute these facts.  Green has therefore failed to demonstrate that she was discharged in retaliation for exercising her rights.  *See Hartsel*, 87 F.3d at 804 ("summary judgment is appropriate where . . . 'a reasonable jury could not fail to conclude from the uncontested evidence that [defendant] ... would have fired her even if she had not [engaged in the protected conduct].'") (quoting *Langford v. Lane*, 921 F.3d 677, 683 (6th Cir. 1991); *see also Wasek*, 682 F.3d at 472 (finding that defendant "had an intervening legitimate reason to

---

[10]The Court also notes that Green had withdrawn her second discrimination charge before the investigation occurred because COTA had transferred her to its downtown administrative offices to accommodate her disability.

discipline [plaintiff], and that reason dispels an inference of retaliation based on temporal proximity.").

Green's other attempts to demonstrate that a genuine issue of material fact exists as to causation are likewise unavailing. First, Green's complaint that she was systematically harassed by upper management, shuffled between supervisors, and ultimately placed under the supervision of Hancock, who had problems with her work, does not demonstrate causation. Because COTA's decision to transfer Green and put her under the supervision of Hancock occurred before she engaged in the protected activity, these alleged actions cannot constitute retaliation. *Michael*, 496 F.3d at 596 (finding that the plaintiff must raise the inference that the protected activity was the likely reason for the retaliatory action to demonstrate a *prima facie* claim of retaliation). The only adverse employment actions that occurred after Green filed charges are COTA's investigation into Green's timecard falsification and her termination.

Green also submits that the fact that she had very few disciplinary actions while at COTA, and had never been written up for attendance issues, demonstrates that COTA discharged her for retaliatory reasons. She points to the fact that Hancock received at least two final warnings for misconduct and was never fired. The Court finds Green's contention unavailing because Hancock is not an appropriate comparator. Because Green and Hancock were employed in different roles and disciplined for different misconduct, they are not similarly situated. *See Benison v. Ross*, 765 F.3d 649, 662 (6th Cir. 2014) ("A plaintiff who chooses to prove retaliatory intent by using comparators must show that he [or she] 'and the employee with whom [he or she] seeks to compare himself [or herself] ... [are] similar in all of the *relevant* aspects.'") (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). Further, COTA

17

presents evidence that it has terminated other employees for timecard violations (COTA's Resp. to Pl.'s Interrog. No. 9, ECF No. 42-42), and Green herself testified that she is not aware of anyone who falsified a timecard that was not disciplined by COTA.  (Green Dep. at pp. 269-70.)

Under these circumstances, no reasonable jury could conclude that Green's protected activity was the likely reason for her termination.

**B.  Pretext**

Even assuming *arguendo* that Green has established a *prima facie* case for retaliation, her claim would still fail because she has not presented sufficient evidence from which a reasonable jury could determine that COTA's articulated legitimate, non-discriminatory reason for terminating Green was a pretext for retaliation.

Once a plaintiff makes a *prima facie* case of retaliation, "[t]he burden then shifts to [the defendant] to articulate a legitimate, nondiscriminatory reason for [the adverse action]." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Skrjanc v. Great Lakes Power Serv. Co.*, 273 F.3d 309, 315 (6th Cir. 2001)).  If the defendant articulates such a reason, the plaintiff bears the ultimate burden of proving that "the proffered reason for the action was merely a pretext for discrimination." *Penny*, 128 F.3d at 415.   The Court of Appeals for the Sixth Circuit has explained plaintiff's burden as follows:

> Under the law of our circuit, a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action. . . . At bottom the question is always whether the employer made up its stated reason to conceal intentional [retaliation].

*Tingle*, 692 F.3d at 530 (internal citations omitted).  "'At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the

18

employer's explanation.  If so, her prima facie case is sufficient to support an inference of discrimination at trial.'"  *Montell v. Diversified Clinical Servs., Inc.,* 757 F.3d 497, 508 (6th Cir. 2014) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009)).

COTA maintains that Green was terminated for theft of time and timecard falsification. Because COTA has proffered a legitimate, nondiscriminatory reason for terminating her employment, Green has the burden of demonstrating that reason is a pretext for retaliation. Green's position is that summary judgment is inappropriate because a genuine issue of material fact exists over whether she stole time from COTA.  She asserts that "[a]t the heart of the case is whether [Green] was paid for time she did not work that was submitted." (Pl.'s Resp. in Opp. 17, ECF No. 49.)  Put another way, Green contends that COTA's proffered reason for her termination was pretextual because it had no basis in fact.

The Court first notes that Green cannot use this lawsuit as a vehicle for challenging the accuracy of COTA's investigation into her timecard violations.  *See Tingle*, 692 F.3d at 530 ("a case alleging unlawful retaliation is not a vehicle for litigating the accuracy of the employer's grounds for termination.")  Rather, "the employee . . . must offer some evidence that not only were the employer's reasons false, but that retaliation was the real reason for the adverse action." *Id.*  Further, when an employer has an "honest belief" in the nondiscriminatory reason upon which it made the adverse employment decision, the employee will not be able to establish pretext.  *Id.* (citing *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). "The key inquiry in assessing whether an employer holds such an honest belief is 'whether the employer made a reasonably informed and considered decision before taking' the

19

complained-of action." *Michael*, 496 F.3d at 598 (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

Here, COTA has submitted evidence that Green arrived late to work and/or left early on numerous occasions.  Given that Green does not submit any evidence to dispute COTA's findings, other than her assertion that she did not steal time,[11] she fails to demonstrate that COTA's reasons for terminating her employment were false.  Notably, when asked to identify herself in photos that allegedly depicted her leaving early, Green testified "I'm not disputing, but I'm just saying I can't tell if it's me or not."  (Green Dep. at p. 243, ECF No. 40-1.)

Additionally, the Court concludes that COTA had an "honest belief" in the nondiscriminatory reason for which it terminated Green's employment.  COTA made a reasonably informed decision before discharging Green.  Smith authorized Tompkins to investigate Green's timecard falsification, Tompkins presented the results of that investigation to management, and management discussed possible disciplinary sanctions before deciding to terminate her employment.  Green's disagreement with the facts uncovered in COTA's investigation does not create a genuine issue of material fact that would defeat COTA's Motion for Summary Judgment.  *Michaels*, 496 F.3d at 598.  Further, as explained in detail above, Green's opinions and beliefs, standing alone, cannot support her claim that retaliation was the real reason for her discharge.  Accordingly, because COTA had an honest belief that she falsified her timecard, Green cannot establish pretext.  Green has therefore failed to present evidence from

---

[11]Green's contention that she could not have falsified her timecard because her supervisors approved it is unavailing.  Accepting Green's contention would require the Court to assume that Green's supervisors witnessed her arrival and departure on a daily basis.  Further, the record reflects instances where Hancock and Zeno addressed Green's attendance and asked her to change her timecard to reflect actual time worked.

which a reasonable jury could conclude that retaliation was the real reason for her termination.

**IV.    CONCLUSION**

For the above stated reasons, COTA's Motion for Summary Judgment is **GRANTED**.

(ECF No. 41.)  The Clerk is **DIRECTED** to **ENTER JUDGMENT** in favor of COTA.


       **IT IS SO ORDERED.**

Date: May 11, 2015                              _/s/ Elizabeth A. Preston Deavers_
                                            Elizabeth A. Preston Deavers
                                            United States Magistrate Judge